

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
03/24/2011

| | | |
|---|---|---|
| IN RE: | § | |
| YAZOO PIPELINE CO., L.P., *et al*, | § | Case No. 08-38121 |
| Debtor(s). | § | |
| | § | Chapter 7 |
| | § | |
| JOSEPH M HILL CH 7 TRUSTEE, *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | Adversary No. 10-03655 |
| | § | |
| NEW CONCEPT ENERGY, INC., *et al*, | § | |
| Defendant(s). | § | Judge Isgur |

### <u>MEMORANDUM OPINION</u>

For the reasons set forth below, the Court grants, in part, and denies, in part, Defendants'

Motions to Dismiss Plaintiffs' First Amended Complaint.

#### BACKGROUND

On December 23, 2008, Yazoo Pipeline Co., LP, Sterling Exploration & Production Co.,

LLC, and Matagorda Operating Co., LLC, (collectively, "Debtors") filed for chapter 11

bankruptcy relief before this Court.  Sterling was an oil and gas exploration and production

company.  Yazoo was an oil and gas pipeline company; Yazoo's pipelines transported Sterling's

and other companies' oil and gas to shore for delivery to purchasers.  Matagorda was the general

partner of Yazoo and the manager of Sterling.  Defendant Charles Cheatham was the CEO and

sole owner of Yazoo and Sterling, and the president, manager, and sole owner of Matagorda.

This adversary proceeding was commenced on December 2, 2010 by Joseph Hill, chapter

7 Trustee of the Debtors' estates; Mining Oil, Inc.; and Randall Sorrels[1] (collectively,

---

[1] Mining Oil and Sorrels are secured creditors who hold first liens on some of Sterling's assets and junior liens on other Sterling assets.  Sorrels also holds a first lien on Yazoo's assets.

"Plaintiffs") against New Concept Energy, Inc. ("NCE"); Coastland Operations, LLC

("Coastland"); Gulf Coast Exploitation, LLC ("Gulf Coast"); Dave Morgan; John Thibeaux; and

Charles Cheatham (collectively, "Defendants").

Plaintiffs' filed their First Amended Complaint (ECF No. 52) on February 28, 2011.  On

March 14, 2011, NCE, Morgan, Thibeaux, Gulf Coast, and Coastland responded by filing

Motions to Dismiss the Amended Complaint for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6) (ECF Nos. 56-59).

The Court assumes the veracity of the well-pleaded facts in the First Amended Complaint

for the purposes of this Memorandum Opinion[2] and, as set forth below, grants, in part, and

denies, in part, Defendants' Motions to Dismiss.  *See Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct.

1937, 1950, 173 L. Ed. 2d 868 (2009) ("When there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief.").

## 1.  General Background of Debtors' Chapter 11 Proceedings

Before delving into Plaintiffs' specific allegations, it is useful to discuss the unorthodox

manner in which the Debtors' cases were prosecuted.  The Debtors' jointly administered chapter

11 cases were marred by numerous instances of delay, disobedience, and rose-colored projection.

The Court briefly summarizes a few noteworthy examples to provide the underlying context in

---

[2] The Court has also reviewed its prior orders and transcripts from relevant hearings in this case.  The Court has inserted segments of these relevant orders and transcripts to provide a more detailed backdrop to Plaintiffs' allegations.  *See Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.") (quoting Wright & Miller, Federal Practice & Procedure: Civil 3d § 1357).

which Plaintiffs' allegations arose.  These events, which unfolded before the Court, shed light on

the plausibility of Plaintiffs' claims.[3]

### a.  The Court's Show Cause Order and Order Removing Cheatham

On June 4, 2009, the Court issued the following Show Cause Order after Debtors

repeatedly failed to file necessary documents with the Court:

> This case was commenced by the filing of a voluntary petition on
> December 23, 2008.  The Debtors have filed no schedules, no
> statement of financial affairs, and no monthly reports.  At various
> status conferences in the jointly administered cases, the Court has
> made inquiry and been told that the documents would be filed in
> the immediate future or that illness prevented the filing of the
> documents.
>
> The time has expired for further delay.
>
> On June 17, 2009 at 11:00 a.m., the Debtors must appear and show
> cause why the Court should not order the appointment of a chapter
> 11 trustee in case 08-38124 or why case 08-38124 should not be
> converted to a case under chapter 7.

Case No. 08-38121, ECF No. 196.

Furthermore, on June 9, 2009, the Court removed Cheatham from his management

position with the Debtors due to his unauthorized diversion of estate assets:[4]

> During the course of a hearing held on this date on the Debtors'
> motions to use cash collateral and to borrow funds, it was disclosed
> that Charles Cheatham (the Debtors' principal) had diverted estate
> assets to pay a pre-petition debt that exists in his own bankruptcy
> case.  This diversion occurred notwithstanding specific budgetary
> items to the contrary.  Debtors' counsel became aware of the
> diversion only after it occurred, but took no effective action to
> recover the diverted funds.  Accordingly, the Court, acting *sua
> sponte,* but without objection from any party, orders as follows:

---

[3] It is important to note that (i) the undersigned has been the Judge over the Debtors' bankruptcy cases (since they
were filed in late 2008); and (ii) this adversary proceeding is comprised almost entirely of the major players from the
Debtors' main bankruptcy cases.  Given the Court's experience with the Debtors' cases (and the parties involved in
their cases), the Court is uniquely situated to evaluate the plausibility of Plaintiffs' allegations.

[4] Plaintiffs have implicitly alleged that Cheatham failed to fully comply with this Order.

1. Charles Cheatham is removed from all positions of management authority with the Debtors.  Mr. Carlton is designated as the sole manager of the Debtors.  Mr. Carlton is prohibited from taking instructions from Mr. Cheatham.

2. Until such time as the following amounts are recovered into the estates, no further payments may be made to or for the benefit of Mr. Cheatham:

A. All post-petition amounts paid out to or for the benefit of Mr. Cheatham in excess of the amounts that have been authorized by this Court's orders; and

B. All legal and accounting expenses that are incurred to recover the amounts set forth in paragraph 2A hereof.

Case No. 08-38121, ECF No. 207.  *See also* Mot. to Borrow Hr'g Tr. 13:23-18:23, June 9, 2009.

### b.  The Debtors' Unsuccessful Dealings with NCE

Multiple instances of delay and erroneous projection were intrinsically related to the Debtors' dealings with NCE.  NCE, whose business representative was Defendant Dave Morgan, was the Debtors' debtor-in-possession ("DIP") lender as well as the most prominent potential purchaser of the Debtors' assets.

On April 16, 2009, Cheatham testified that NCE was prepared to pay up to $7,000.000.00 to purchase an 80% ownership interest in the Debtors.  Mot. to Borrow Hr'g Tr. 22:20-23:25, April 16, 2009.  This payment allegedly would have enabled the Debtors to pay all of their creditors in full.  *Id.* at 22:20-25.  Cheatham also testified that he expected to finalize a deal with NCE in the very near future.  *Id.* at 57:8-58:3.

On April 23, 2009, the Court authorized the Debtors to borrow up to $300,000.00 in DIP financing from NCE.[5]  As the bankruptcy cases progressed, the Debtors remained unable to

---

[5] *See* Case No. 08-38121, ECF No. 143.

operate without borrowing additional cash. The Court eventually authorized the Debtors to obtain up to $850,000.00[6] in DIP financing from NCE.[7]

On April 28, 2009, the Court approved the Debtors' First Amended Disclosure Statement.[8] The Disclosure Statement provided that the Debtors' bankruptcy plan would be implemented with funds from NCE:

> The Debtors and Robert Cheatham have entered into a Purchase and Sale Agreement (the "PSA") with New Concept Energy, Inc. (or a related entity) ("NCE") . . . . Pursuant to the PSA, NCE has agreed to enter into two separate transactions, effective as of the effective date of this Plan. The first transaction involves a loan from NCE to the Debtors in the amount of up to $6,250,000.00. Such amount is sufficient to pay all allowed claims against the Debtors, leaving all classes of claims unimpaired under this Plan . . . .
>
> The second transaction with NCE involves the purchase by NCE of 80% of Yazoo, 80% of Matagorda and 80% of Sterling, from the current equity holder, Charles Cheatham, for $750,000 . . . .

Case No. 08-38121, ECF No. 160.

Just over a month later, Morgan reaffirmed NCE's ability to fund the Debtors' reorganization. *See* Mot. to Use Cash Collateral Hr'g Tr. 14:1-5, June 5, 2009 (Morgan answering "yes" after being asked, "if the plan is confirmed in the next few weeks, . . . will [NCE] have the financial wherewithal to fund the closing of $7 million?"); *see also id.* at 14:23-15:1 (Morgan testifying that he was not at all worried about NCE's ability to fund $7,000,000.00).

---

[6] The Debtors allegedly spent $692,121.00 of the $850,000.00 throughout the course of the case.

[7] *See* Case No. 08-38121, ECF Nos. 234, 333.

[8] *See* Case No. 08-38121, ECF Nos. 160, 161.

Unfortunately, despite multiple attempts to do so (and multiple amendments to their bankruptcy plan), the Debtors were unable to confirm a plan of reorganization. The claims filed against the Debtors' estates and the post-petition expenses incurred by the Debtors allegedly chilled NCE's willingness to finalize the transactions proposed in the First Amended Disclosure Statement. *See* Confirm. Hr'g Tr. 8:1-12:20, June 30, 2009. There were also questions that arose concerning NCE's financial ability to actually consummate the transactions contemplated in the First Amended Disclosure Statement.[9] Nevertheless, as late as the date of conversion, which was nearly one year after the bankruptcy petitions were filed, the Debtors' counsel represented that he "had additional conversations with [NCE] [and] . . . [t]hey assure[d] me that they are very, very close to getting the money." Mot. to Compel Hr'g Tr. 10:8-10, Dec. 8, 2009.

Overall, after over a six month interval (from April 28, 2009 to December 8, 2009), the Debtors did not get any closer to finalizing their deal with NCE. The deal remained in a perpetual state of being "right around the corner."

### c. The Debtors' Inaccurate Budgets

The Debtors also filed numerous budgets that (i) understated expenses, and/or (ii) erroneously indicated that the Debtors would be operating at a positive cash flow. *See* Mot. to Borrow Hr'g Tr. 76:6-78:4, April 16, 2009; Mot. to Borrow Hr'g Tr. 13:4-22, June 9, 2009;

---

[9] For instance, NCE's counsel informed the Court on July 29, 2009 that it did not yet have the full $7,000,000.00 needed to fund the Debtors' reorganization:

> When we made the offer of $7 million we thought it was going to be fairly easy to obtain the $7 million cash. We thought the creditors seeing the $7 million cash would work together and meld out a way to take it or there would be a path toward taking it. When it became apparent that neither of those assumptions was correct, it wasn't easy to get the $7 million. We don't have it yet. We are working very hard on it. It is relatively easy to get about three million six as a first lien on the assets. And I'll talk about that a bit later. But we still think we'll get to $7 million; we're just not there yet. And I told you last time, your Honor, we would be prepared to close this on September the 15th. I think we will be.

Disclosure Statement Hr'g Tr. 12:11-23, July 29, 2009.

Mot. to Compel Hr'g Tr. 28:17-30:17, Dec. 8, 2009.    The budgets repeatedly proved to be wildly inaccurate.  The Debtors continually operated at a loss while the chapter 11 cases were pending.  *See also* Mot. to Compel Hr'g Tr. 28:17-30:17, Dec. 8, 2009.

### d.  The Court's Conversion Order

On December 8, 2009, the Court found that the Debtors' unsuccessful reorganization efforts had gone on long enough and converted the cases to chapter 7 bankruptcy proceedings. The Court's explanation for ordering conversion provides a summation of the Debtors' shortcomings throughout the pendency of their chapter 11 proceedings:

> I'm converting both cases to cases under Chapter 7.  I find that the debtor is -- has failed to comply with the orders of the Court to pay certain administrative claims by a date certain; I find that the debtor has not been filing its reports timely; and I find that the defense that the debtor puts up, that it's currently at least breaking even, is not proven out by the evidentiary record.

> The event that the debtor says makes it able to pay its debts as they come current is the freeing up of the GLO money.  That started happening in September. We have September, October, November; but only in November did the debtor pay the amounts even on its budget, and then it paid an October month.  So, for three months the debtor gets full payment and is only able to stay current in one of those three months.  I just don't think the debtor's defense is accurate.

> *The debtor, I find, continues to lose money on an ongoing basis.  I have no confidence in the debtor's ability to perform as it might forecast.  Historically, it has miserably failed to meet its forecasts.* During the months of September and October the debtor lost money when it forecast -- well, it lost at least $132,000 more than what it said it was going to do.  It said it would have positives and we know of at least some $30,000 that didn't get paid that were in the budget.  There may be others that didn't get paid; I don't know. *Debtor loses massive amounts of money even when it forecasts it's going to make money.  So, I just don't have any confidence that the debtor can operationally do what the debtor says it's going to do.*

> *That's been a problem from the very beginning of the case where the debtor, in my mind, had extraordinarily unrealistic operating*

7

> *scenarios where it failed to recognize it was incurring huge expenses, failed to report those to the Court.* And although that certainly has gotten a whole lot better once Mr. Carlton came in, operationally the debtor is just not capable of doing what the debtor needs to do.
>
> *How much longer should we wait for a plan to occur when we have had multiple dates by which NCE said that it would be able to perform and just hasn't done it?* That may not be because anybody is a bad person, and I certainly don't think it's because anybody is trying to mislead the Court.[10] *But NCE hasn't been able to do what they said they were going to do. And whenever we get down to the licklog and they need to perform, they don't perform.* They're asking for one more opportunity, but during that one more opportunity have the debtor not performing, in whom the Court has lost all confidence. I have a creditor that wants me to put the debtor's management in jail for not complying with an order, which isn't the right remedy. The right remedy is one of conversion. And it may not be supported by creditors generally, but it's what the bankruptcy code requires me to do.

Mot. to Compel Hr'g Tr. 36:24-38:23, Dec. 8, 2009  (emphasis added).

### 2. Plaintiffs' Allegations Against Defendants

For the purposes of this Memorandum Opinion only, the Court accepts the Plaintiffs' well-pleaded factual allegations as true. *Iqbal*, 129 S. Ct. at 1950. Any apparent factual findings or conclusions (that are based upon Plaintiffs' allegations) are dispositive only under the framework of a Rule 12(b)(6) motion, and Defendants will remain free to contest the underlying factual basis of all Plaintiffs' allegations in the future. *See also Briggs v. Oklahoma ex rel. Dept. of Human Servs.*, 472 F. Supp. 2d 1288, 1290 (W.D. Okla. 2007) ("It is not the objective of Rule 12(b)(6) to formulate issues for trial [and] . . . the Court's task at this stage 'is not to weigh potential evidence that the parties might present at trial,' or decide whether [the plaintiff] will ultimately prevail against [the] defendant.") (quoting *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006)).

---

[10] The Plaintiffs implicitly argue that this conclusion was incorrect.

As discussed below, the Plaintiffs' allegations include, among other things, claims that one or more of the Defendants: (i) diverted estate assets without Court authorization, (ii) misrepresented NCE's interest in the Debtors' assets, (iii) permitted a valuable oil and gas lease to lapse and then purchased the lease for their benefit through an unrelated entity, (iv) misappropriated Debtors' data, and (v) filed inaccurate and misleading budgets and monthly operating reports.

### a.  Morgan's & Thibeaux's Control of the Debtors

Plaintiffs allege that, by May of 2009, Cheatham had ceded his managerial control of the Debtors' operations to Morgan and Defendant John Thibeaux.[11]  Thereafter, Morgan allegedly controlled the Debtors' expenditures and Thibeaux controlled the Debtors' oil and gas operations.   During their period of control, Morgan and Thibeaux allegedly spent over $1,400,000.00 of Debtors' cash collateral without Court authority.   These unauthorized expenditures were not reported in the Debtors' monthly operating reports.

Morgan and Thibeaux also allegedly failed to disclose material business plans, discussed below, that were taking place outside of the Debtors' ordinary course of business.

### b.  The Wrongful Perpetuation of Debtors' Chapter 11 Cases

Plaintiffs also claim that Morgan and NCE wrongfully prolonged the chapter 11 proceedings by misrepresenting NCE's intention to purchase the Debtors' assets.  According to Plaintiffs, by July 2009, NCE had determined that it was not interested in purchasing the assets. Thereafter, Morgan nevertheless continued to represent NCE's desire to purchase the Debtors' assets.  As a consequence of NCE's alleged misrepresentations, the Debtors' remained in chapter 11 well beyond the point at which they could have been successfully reorganized.  Had NCE

---

[11] Plaintiffs do not claim, however, that Cheatham no longer exercised influence over the Debtors (or control over the Debtors, indirectly, through Morgan and Thibeaux).  To the contrary, Plaintiffs essentially argue that Cheatham remained in the position to control and/or influence the Debtors.

9

voiced its change of heart earlier, the Debtors bankruptcy cases could have been converted to chapter 7 before December 8, 2009 and unnecessary expenses may not have been incurred.

### c.   The Expiration and Subsequent Acquisition of the N/2 ST52 Lease

Plaintiffs further argue that Cheatham, Morgan, and Thibeaux permitted one of the estate's most valuable assets, a lease from the State of Texas of the north half of High Island State Tract 52 ("N/2 ST52"), to be transferred out of the Sterling bankruptcy estate.   The contentions are implicitly based upon an alleged step-transaction in which the Defendants allegedly allowed the lease to expire with the intent of repurchasing the lease from the State of Texas.   The allegations are complex and are repeated in this section merely to set forth the Plaintiffs' arguments.

Cheatham was the first individual to learn that there were significant and valuable oil and gas reserves under N/2 ST52.   Once Morgan and Thibeaux gained control of the Debtors, they also allegedly learned (through the course of geologic studies of the Sterling properties at the Sterling estate's expense) that Sterling's best reserves were likely under N/2 ST52.

Cheatham, Morgan, and Thibeaux knew the N/2 ST52 lease was scheduled to expire on October 19, 2009.   Cheatham was aware that the Debtors could avoid the expiration of the lease by asking the Texas General Land Office ("GLO") to "pool" the N/2 ST52 lease with its neighboring leases.   No such request was made.   Similarly, no one informed the Court or the Plaintiffs that one of the most valuable assets of the Sterling estate was about to expire.   Instead, Cheatham, Morgan, and Thibeaux remained silent and allowed the lease to lapse.

In March of 2010, the GLO conducted a seal-bid auction for the N/2 ST52 lease. Thibeaux allegedly informed the Trustee that he was going to purchase the lease but failed to mention that the lease had been property of the Sterling estate.   Defendant Gulf Coast, a

company owned by Thibeaux and for which Cheatham was employed, won the auction and acquired N/2 ST52 for $323,000.00.  The sale price was approximately seven times greater than the purchase price of adjacent leases.

### d.  Defendants' Misuse of the Estates' Data and Business Opportunities

Plaintiffs also claim that Defendants misused the estates' data.  Thibeaux and Morgan caused the copying of Sterling's proprietary seismic data from computers owned by the bankruptcy estates.  Morgan and Thibeaux also repeatedly visited the "data room" at EMS (the Trustee's operator) to review additional information and documentation owned by Sterling.

According to Plaintiffs, Defendants used this data in various ways with the goal of benefitting themselves, not the bankruptcy estates.  Defendant Coastland[12] used the estates' data to evaluate and purchase leases in Matagorda Bay.  Gulf Coast used Sterling data to evaluate and purchase the N/2 ST52 lease.

Coastland and/or NCE also learned of Sterling's potential opportunity to acquire certain properties owned by Main Energy, Inc.  Defendants would not have discovered this opportunity without Sterling's data.  Coastland and/or NCE acquired certain Main Energy properties that should have been purchased on behalf of Sterling.

### 3.  Plaintiffs' Claims against Defendants

Based on the factual allegations summarized above, Plaintiffs assert the following causes of action against one or more Defendants: (i) "undue influence and breach of fiduciary duty," (ii) aiding and abetting a breach of fiduciary duty, (iii) conspiracy, (iv) fraud, (v) "conversion/unjust enrichment/self-dealing," (vi) respondeat superior, and (vii) avoidance of

---

[12] Coastland was formed in June 2009 by Morgan as an entity that would manage the estates' properties.  Thibeaux and Morgan were officers and/or agents for Coastland.  Plaintiffs believe that Cheatham was also an officer of Coastland.  Plaintiffs allege that Coastland was intended to be used as a vector for siphoning off revenues (for the benefit of Morgan, Thibeaux, Cheatham, and others) generated by the estates.

post-petition transfer.  Plaintiffs also seek an injunction prohibiting the transfer of N/2 ST52 and any proprietary date previously owned by the bankruptcy estate.

Defendants NCE, Morgan, Coastland, Gulf Coast, and Thibeaux have filed Motions to Dismiss the Plaintiffs' Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[13]

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a

---

[13] Cheatham did not file a motion to dismiss; therefore, the Plaintiffs' claims against Cheatham survive even if the Court dismisses the same claims against other Defendants.  *See* Wright & Miller, Federal Practice & Procedure: Civil 2d § 1349 ("The movant may obtain relief only as to himself; he has no standing to seek dismissal of the action as to nonmoving parties.").  Any mention of the claims against Cheatham in this Memorandum Opinion is done in order to provide additional context for the claims against the Defendants who have filed Motions to Dismiss.

Furthermore, the Motions to Dismiss do not address Plaintiffs' claims for respondeat superior and injunctive relief.  Accordingly, the Court need not consider whether dismissal of those claims is appropriate.

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations omitted).

Overall, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

ANALYSIS

For the reasons set forth below, the Court dismisses the following claims:

1.      Plaintiffs' claim for undue influence against Thibeaux and Morgan;

2.      Plaintiffs' claim for fraud against Gulf Coast and Coastland;

3.      Plaintiffs' claim for fraud by nondisclosure against all Defendants (except Cheatham);

4.       Plaintiffs' claim for conversion against all Defendants (except Cheatham); and

5.      Plaintiffs' claim for self-dealing against all Defendants (except Cheatham).

All other relief sought in Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint is denied.

**1.  Plaintiffs' Claim for "Undue Influence and Breach of Fiduciary Duty"**

The first count raised in Plaintiffs' Amended Complaint is against Cheatham, Morgan, and Thibeaux for "undue influence and breach of fiduciary duty."[14]  *See* ECF No. 52 ¶ 36.  The

---

[14] It does not appear that the first count includes NCE, Coastland, or Gulf Coast.  Of those three defendants, the only party mentioned whatsoever is NCE.  However, the Plaintiffs fail to offer any well-pleaded allegations against NCE.  Thus, to the extent the Court is mistaken and the first count is meant to include NCE, Coastland, and/or Gulf Coast, the first count is nevertheless dismissed for lack of plausibility as to those three defendants.

Court re-characterizes the count as two separate counts—one for undue influence and the other for breach of fiduciary duty—against the three individuals. *See Thomas W. Garland Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir. 1979) ("[C]omplaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory."); Wright & Miller, Federal Practice & Procedure: Civil 2d § 1357 ("[I]t need not appear that plaintiff can obtain the particular relief prayed for, as long as the court can ascertain that some relief may be granted.").

The Court concludes that the Plaintiffs have stated plausible claims against Morgan and Thibeaux for breach of their fiduciary duties and, therefore, denies dismissal of those claims. Below, the Court also discusses the claim for breach of fiduciary duty against Cheatham. Cheatham has not filed a motion to dismiss and any analysis concerning his alleged control or breaches of fiduciary duty is meant to provide context for the claims[15] against Morgan and Thibeaux.

The Court finds that Plaintiffs have failed to raise a plausible claim for undue influence against either Thibeaux or Morgan. Plaintiffs' undue influence claim against those two individuals is dismissed.

### a.   Plaintiffs Have Raised a Plausible Claim for Breach of Fiduciary Duty

The Court finds that the Plaintiffs have raised plausible and specific claims for breach of fiduciary duty against Morgan and Thibeaux. This conclusion is based upon the First Amended Complaint's well-pleaded facts and the Court's experience with the Debtors' cases over the past two years.

---

[15] These claims include breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy.

The Court's analysis begins with a discussion of the plausibility of Plaintiffs' theory that Cheatham, Morgan, and Thibeaux controlled the Debtors. After establishing the plausibility of control, the Court examines Plaintiffs' theory that Cheatham, Morgan, and Thibeaux breached the fiduciary duties that accompanied their control over the Debtors. *See Lange v. Schropp (In re Brook Valley VII, Joint Venture)*, 496 F.3d 892, 900 (8th Cir. 2007) ("Debtors in possession and those who control them owe fiduciary duties to the bankruptcy estate.").

### i.   It is Plausible Defendants Exercised Control Over the Debtors

On June 9, 2009, the Court removed Cheatham from his management position with the Debtors and appointed Carlton—who was, essentially, the Debtors' accountant and bookkeeper—in Cheatham's place. Due to Carlton's inexperience in managing the Debtors' affairs, the Court finds it plausible that other, more experienced individuals exerted control of the Debtors, essentially filling the vacuum created by Cheatham's reduced role. According to Plaintiffs, Thibeaux and Morgan are two such individuals.

### 1.   Morgan's Control of the Debtors

Morgan's alleged control of the Debtors is plausible. He was the representative of NCE, which was both the Debtors' DIP lender and the most active potential purchaser of the Debtors' assets.

Plaintiffs have attached a September 25, 2009 e-mail communication to their First Amended Complaint indicating that Morgan intended to exercise managerial control over the Debtors through Coastland. Pls.' Ex. 2. The e-mail, which was sent by Morgan to Cheatham's personal attorney, provided, in part, "[u]nder the acquisition structure, Coastland Operations, LLC, which is in the process of being transferred to an entity under my control, will be the

'Advisor' under an Advisory Agreement with Sterling/Yazoo and *manage the operations of Sterling/Yazoo . . . .*" *See id.* (emphasis added).

Moreover, according to Plaintiffs, Morgan controlled the Debtors' financial operations. During his period of control, Morgan oversaw the near doubling of the estates' post-petition expenses.  Morgan allegedly spent approximately $1.4 million of cash collateral without Court authorization.  Such expenditures are consistent with the woefully inaccurate budgets and monthly operating reports that the Debtors created throughout the chapter 11 proceedings.

Plaintiffs have plausibly alleged that Morgan controlled the Debtors.

### 2.  Thibeaux's Control of the Debtors

The Court also finds plausibility in Plaintiffs' claim that Thibeaux controlled the Debtors by handling their oil and gas operations.  Given Carlton's inexperience in handling the oil and gas operations (which were normally handled by Cheatham), it is plausible that another individual stepped in to fill Cheatham's shoes.

Thibeaux provided consulting services to NCE.  Plaintiffs contend that Thibeaux was also an officer and/or employee of Coastland, the entity that (i) planned to manage the Debtors' operations, and (ii) purchased leases in Matagorda Bay with the assistance of the Debtors' data.

Thibeaux also owned and controlled VGHI Gulf Coast Holdings, LLC ("VGHI") and its venture partner, Gulf Coast.  It was Gulf Coast that purchased the N/2 ST52 tract after the alleged suspicious expiration of Sterling's lease.

Given Plaintiffs' assertions concerning Thibeaux's close dealings with the Debtors and intimate familiarity with the Debtors' assets and operations, it is plausible that Thibeaux controlled the Debtors (and therefore entered into a fiduciary relationship with the Debtors).

16

Thibeaux nevertheless argues that a third party does not become a fiduciary to a debtor merely through exercising control over the debtor.  Thibeaux quotes the Fifth Circuit's decision in *U.S. Abatement Corp.* in support of his theory: "[debtor] appears to assert that the mere existence of control or domination over the debtor gives rise to a fiduciary relationship.  Such a theory would . . . turn the law of fiduciary relationships on its head."  *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 39 F.3d 556, 561 n.5 (5th Cir. 1994).  However, upon a complete reading of the Fifth Circuit's opinion, it becomes evident that the level of control alleged in this case is distinguishable from the control at issue in *U.S. Abatement*.  Thibeaux's reliance upon *U.S. Abatement* is misplaced.

The debtor in *U.S. Abatement* argued that Mobil owed it a fiduciary duty due to Mobil's "economic leverage" over the debtor.  *Id.* at 562.  There was no claim that Mobil actually controlled the debtor's operations; Mobil was simply a third party that had contracted to do business with the debtor.  *Id.* at 561.  The alleged control arose through a provision in the parties' contract that permitted Mobil to withhold payment in the event that subcontractors asserted liens against Mobil's property.  *Id.* at 559.  This provision was inserted to create "*leverage* to ensure that [debtor] paid off all subcontractors who might assert liens against Mobil's property."  *Id.* (emphasis added).  Mobil subsequently withheld payment, which inhibited the debtor's cash flow to the point it was forced to file bankruptcy.  *Id.* at 562.

The Fifth Circuit held that, despite the influence Mobil possessed due to its contractual right to withhold payment, Mobil did not owe the debtor a fiduciary duty:

> While Mobil's withholding of payment certainly created *economic hardship* for USA, the act of withholding was made pursuant to Mobil's contractual right to do so.  Thus, as in *Clark Pipe,* Mobil's actions created *economic leverage* to force USA to pay off the subcontractors who had filed liens on Mobil's property prior to paying off other creditors.  Yet this *economic leverage*, asserted by

17

> Mobil pursuant to the terms of the contracts, did not give Mobil
> inequitable *control* over USA.

*Id.* (emphasis added).

The control at issue in this case is quite different from the economic leverage found in *U.S. Abatement*. Plaintiffs here allege that Thibeaux actually controlled the Debtors by managing their oil and gas operations; conversely, the debtor in *U.S. Abatement* did not claim that Mobil actually controlled its operations. Similarly, there is no allegation that Thibeaux controlled the Debtors through exercising any sort of economic leverage.

Individuals who control a debtor-in-possession owe it a fiduciary duty. *Lange*, 496 F.3d at 900. The economic leverage in *U.S. Abatement* is distinguishable from the actual control that was (plausibly) exercised by Thibeaux over the Debtors.

### 3. Cheatham's Control of the Debtors

The Court also finds it plausible that Cheatham, although removed by Court order from his management position with the Debtors, maintained some degree of control over the Debtors' operations. Cheatham was the Debtors' owner and he has demonstrated a willingness to flaunt Court orders in the past. This flaunting of Court orders included the unauthorized expenditure of estate property. The Court finds it plausible that—given the allegation of numerous unauthorized expenditures (by Morgan and Thibeaux) and the Court's awareness of the Debtors' failure to provide accurate budgets and monthly operating reports—Cheatham may have been the recipient or beneficiary of additional unauthorized transfers or expenditures after his removal. Cheatham also may have induced such expenditures and/or transfers.

Plaintiffs also allege that Cheatham was employed by (and possibly an officer of) Coastland and Gulf Coast, two companies with close ties to Thibeaux, Morgan, and, to some

degree, the Debtors.  Cheatham's superior knowledge of the Debtors' operations would have been valuable to those entities, Morgan, and Thibeaux.

Furthermore, the Court finds it plausible that Cheatham, the Debtors' principal, remained silent while the N/2 ST52 lease expired because he stood to benefit alongside Thibeaux and Morgan from the lease's expiration.

Accordingly, given Cheatham's relationships with the other Defendants, it is plausible that Cheatham continued to exercise some level of control or influence over the Debtors even after his removal on June 9, 2009.

### ii.   It is Plausible Defendants Breached Their Fiduciary Duties

The Court finds the allegations that Cheatham, Morgan, and Thibeaux breached the fiduciary duties they owed to the bankruptcy estates and their creditors are plausible.  *See Lange*, 496 F.3d at 900; *see also Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S. Ct. 969, 10 L. Ed. 2d 33 (1963) ("[S]o long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession.").

Individuals controlling a DIP owe it the duties of care and loyalty. *Lange*, 496 F.3d at 900.  "The duty of care requires the fiduciary to make good-faith decisions that can be attributed to a rational business purpose."  *Id.*  "In general, courts do not second-guess business decisions made in good faith."  *Id.*  "The duty of loyalty comes into play when there appears to be a conflict between the interests of the fiduciary and the entity to which he owes loyalty."  *Id.* "For a debtor in possession, this duty 'includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly and

to maximize the value of the estate.'" *Id.* at 900-01 (quoting 7 *Collier on Bankruptcy* ¶ 1107.02[4]).

It is plausible that Cheatham, Morgan, and Thibeaux breached both their duties of care and loyalty. The most detailed allegations, which exemplify the Court's conclusion, are found in the Complaint's discussion of the N/2 ST52 lease's expiration. Plaintiffs allege that by October of 2009, all three defendants were aware of (i) the valuable reserves under N/2 ST52, and (ii) the impending expiration of the Debtors' interest in N/2 ST52. The Plaintiffs also allege that the expiration of the lease could have been postponed through a "pooling" request. However, the Defendants did not make a "pooling" request. The lease allegedly expired without Cheatham, Morgan, or Thibeaux making any effort to retain it on behalf of the bankruptcy estate.

If the allegations are true, the Court fails to see a rational business purpose behind quietly allowing a valuable asset to exit the bankruptcy estate without receiving any value in return. The irrationality of such conduct is exacerbated by the likelihood that the lease could have been retained by the estate at little expense (especially when considering the cost of retention compared with the potential value of the asset). Accordingly, the Court finds that the Plaintiffs have alleged a plausible claim that Cheatham, Morgan, and Thibeuax breached their duties of care when they let the N/2 ST52 lease expire.

Moreover, Plaintiffs allege that after Cheatham, Morgan, and Thibeaux failed to prevent the lapsing of the N/2 ST52 lease, a company with which they were affiliated, and then bid $323,000.00 to acquire the lease. The N/2 ST52 bid was over seven times greater than bids made on neighboring leases. This allegedly shows that the lease did have significant value, of which Cheatham, Morgan, and Thibeaux were aware, that should have been retained by the estate. The magnitude of the bid also allegedly demonstrates that the three individuals may have

breached the duty of loyalty they owed to the Debtors.  *See id.* at 901 ("Courts have held that managers of debtors in possession breached their duty of loyalty by . . . participating as an undisclosed bidder at an auction of estate property.") (citations omitted).   Clearly, such allegations indicate that Cheatham, Morgan, and Thibeaux put their own interests ahead of the Debtors' interests: they reduced the estates' value in order to maximize the profit Gulf Coast could generate through the development of the N/2 ST52 reserves.  This constitutes a plausible claim for breach of the duty of loyalty.

Plaintiffs also claim that Morgan, Cheatham, and Thibeaux took other actions that breached their fiduciary duties.  However, since the Plaintiffs have stated a plausible claim for breach of fiduciary duty arising from the expiration and acquisition of the N/2 ST52 lease, the Court need not consider whether other alleged facts would satisfy a claim for breach of fiduciary duty.[16]  The motions to dismiss Plaintiffs' claim for breach of fiduciary duty are denied.

### b.  Plaintiffs' Claim for Undue Influence Against Thibeaux and Morgan

The Plaintiffs also assert a claim for undue influence against Thibeaux, Cheatham, and Morgan.  The Court grants Thibeaux's and Morgan's Motions to Dismiss the undue influence claims against them.

Plaintiffs fail to cite authority standing for the proposition that Thibeaux and Morgan, as individuals in control of the Debtors, could also have exerted undue influence over the Debtors. The authority cited by Plaintiffs does not directly address the tort of undue influence and the Court is unaware of the existence of such a cause of action under the circumstances alleged by

---

[16] "The motion to dismiss for failure to state a claim upon which relief can be granted raises the issue of the sufficiency of the complaint to state a redressable claim."  *Pointer v. American Oil Co.*, 295 F.Supp. 573, 576 (D.C. Ind. 1968).  "In other words, the motion raises the broad issue of the justiciability under pertinent rules of law of the asserted cause of action."  *Id.*   "More specifically, two issues are raised: (1) whether a claim is stated, and (2) whether relief can be granted thereon."  *Id.*  Here, Plaintiffs have plausibly stated a redressable claim for breach of fiduciary duty and, therefore, the Court denies the motions to dismiss this claim.

Plaintiffs.  *See Fillion v. Troy*, 656 S.W.2d 912, 915-16 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (undue influence in the execution of a deed); 10 Tex. Jur. 3d *Cancellation and Reformation* § 30 (undue influence in the formation of wills, deeds, and other instruments). Plaintiffs simply place the label of undue influence upon Thibeaux's and Morgan's conduct, but fail to elaborate upon either the elements or the applicability (based upon their factual allegations) of an undue influence claim.  Thus, dismissal is appropriate.

The Court further finds that Plaintiffs' allegations fail to comport with the basic definition of an undue influence claim.

Undue influence is generally defined as that "dominion acquired by one person over the mind of another that prevents the latter from exercising his or her discretion, that destroys his or her free agency, and that compels such a person to do something against his or her will from fear, or from a desire of peace, or from some feeling that he or she is unable to resist." 31A TEX. JUR. 3d *Duress and Undue Influence* § 15.  "In order to prove undue influence, one must demonstrate that 'persuasion, entreaty, importunity, argument, intercession, and solicitation' were so strong as to 'subvert and overthrow the will of the person to whom they are directed.'"  *Lee v. Hunt*, 631 F.2d 1171, 1178 (5th Cir. 1980) (quoting *DeGrassi v. DeGrassi*, 533 S.W.2d 81, 85 (Tex. Civ. App. Amarillo 1976, writ ref. n.r.e.)).

Plaintiffs fail to plead facts consistent with a claim of undue influence.  Generally speaking, an undue influence claim arises when one individual unduly asserts his or her will over that of another individual who possesses some form of control or authority over a potential course of action.  Here, however, Plaintiffs allege that Thibeaux and Morgan were the individuals with control over the Debtors; Plaintiffs do not allege that Thibeaux and Morgan

exercised undue influence over another individual who was in control.  This failure to allege influence over another individual is fatal to Plaintiffs' undue influence claim.

Moreover, the Court finds that it would have been impossible for Thibeaux and Morgan to have exerted undue influence directly over the Debtors.  The Debtors are business associations that function in accordance with the dictates of those individuals who control them.  Undue influence requires the exercise of one person's will over the will of another person. Thibeaux and Morgan could not have exerted undue influence directly over the Debtors because the Debtors did not have an independent will for Thibeaux and Morgan to unduly influence.

A claim for undue influence has not been properly alleged in the Plaintiffs' First Amended Complaint.   The Court dismisses Plaintiffs' claim for undue influence against Thibeaux and Morgan.

### 2.   Plaintiffs Have Raised a Plausible Claim for Aiding and Abetting

Plaintiffs' second cause of action is against Morgan and Thibeaux for allegedly aiding and abetting Cheatham in breaching his fiduciary duties.  The Court finds that Plaintiffs have stated a plausible claim for aiding and abetting against Morgan and Thibeaux.

Under Texas law, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942)).  To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Id.* (citations omitted).  "Participating" in wrongful conduct includes "[i]nstigating, aiding or

abetting" such conduct.  *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 701 (Tex. App.—Forth Worth 2006, pet. denied).

As set forth above, it is plausible that Cheatham, the Debtors' principal, owed a fiduciary duty to the Debtors even after he was removed from his management position by order of this Court.  This satisfies the "existence of a fiduciary relationship" requirement.

Morgan and Thibeaux also knew that Cheatham was the Debtors' owner and, before he was relieved of his duties, manager.  It is, therefore, plausible that Morgan and Thibeaux had knowledge of Cheatham's fiduciary duties to the Debtors.

Finally, it is plausible that Morgan and Thibeaux instigated, assisted, aided, or participated in Cheatham's alleged breaches of the fiduciary duties he owed the Debtors.  For instance, while employing Cheatham, Thibeaux's company acquired the N/2 ST52 lease.  According to Plaintiffs, Thibeaux also informed the Trustee that Gulf Coast was purchasing the N/2 ST52 lease, but failed to mention that the lease was previously property of the estate.  The Trustee was also unaware that Cheatham was employed by Gulf Coast.  It is plausible that Thibeaux assisted Cheatham in breaching his fiduciary duties to the Debtors through Gulf Coast. Thibeaux allegedly made it possible for Cheatham to benefit from the estates' loss of the N/2 ST52 lease, which encouraged Cheatham to remain silent while the lease expired.

Similarly, the Plaintiffs allege that Coastland, a company formed by Morgan (and employing Thibeaux), used estate data to evaluate and purchase leases in Matagorda Bay. Morgan also allegedly intended to use (and may, in fact, have used) Coastland to manage the operations of the Debtors.  Coastland employed Cheatham.  It is plausible that Morgan assisted Cheatham in breaching his fiduciary duties by using Cheatham's services for the benefit of

Coastland and at the expense of the Debtors.  It is plausible that Coastland, like Gulf Coast, was a vector through which Cheatham, Morgan, and Thibeaux depleted estate assets.

Morgan may also have assisted Cheatham in breaching his fiduciary duties during the course of Morgan's representation of NCE.  Plaintiffs allege that NCE continued to represent (to the Court and creditors) that it intended to purchase the Debtors' assets months after NCE informed the Debtors that it was not interested in doing so.  According to Plaintiffs, these representations prolonged the pendency of the Debtors' chapter 11 cases beyond the point at which a successful reorganization would have been possible.  Morgan, Thibeaux, and Cheatham may have benefited from the perpetuation of the chapter 11 proceedings because it enabled them to maintain control over the Debtors.  Had the cases been converted to chapter 7 sooner (and a chapter 7 trustee been appointed), the control allegedly exercised by Morgan, Thibeaux, and Cheatham would have evaporated more quickly.  Based on Cheatham's close dealings with Morgan, it is plausible that Cheatham was aware NCE's representations were inaccurate.  It is therefore plausible that Morgan's representations assisted Cheatham in exercising control or influence over the Debtors for the benefit of Morgan, Cheatham, Thibeaux, Gulf Coast, and/or Coastland, and at the expense of the bankruptcy estate and its creditors.

Plaintiffs have stated a plausible claim that Morgan and Thibeaux knowingly participated in Cheatham's breaches of fiduciary duties.  The Motions to Dismiss Plaintiffs' claim for aiding and abetting are denied.

### 3.  Plaintiffs Have Raised a Plausible Claim for Civil Conspiracy

Plaintiffs' third cause of action is for civil conspiracy against Cheatham, Morgan, and Thibeaux.  The Court finds that Plaintiffs have stated a plausible claim for civil conspiracy against Morgan and Thibeaux.

"The essential elements [of civil conspiracy] are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). However, "merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy.'" *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (quoting *Triplex Commc'ns Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995)). "Instead, 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" *Id.* (quoting *Triplex*, 900 S.W.2d at 719).

"Civil conspiracy is a separate cause of action that requires, *inter alia,* an underlying tort and a 'meeting of the minds' among the coconspirator[s] 'on the object or course of action' to be taken." *Floyd v. Hefner*, 556 F. Supp. 2d 617, 659-60 (S.D. Tex. 2008) (citation omitted). "By contrast, a cause of action under *Cox* and *Kinzbach* [for aiding and abetting] requires only the knowing participation of a party in a breach of a fiduciary duty and does not require a conspiratorial agreement." *Id.* at 660 (citations omitted).

The plausibility of Plaintiffs civil conspiracy claim is exemplified in the allegations surrounding the expiration and subsequent acquisition of the N/2 ST52 lease. First, the alleged conduct of Cheatham, Morgan, and Thibeaux easily satisfies the first two civil conspiracy requirements. Based on facts set forth above, Plaintiffs have levied a plausible claim that the three individual defendants worked together to accomplish their goal of acquiring the Sterling estate's most valuable asset, the N/2 ST52 lease.

It is also plausible that the three defendants reached a meeting of the minds. It is unlikely that Cheatham would have remained quiet while one of the most valuable assets of a company he

owned and managed exited the bankruptcy estate, unless he stood to gain from the asset's departure.  Plaintiffs contend that all three defendants also worked together at Coastland and Gulf Coast, two companies with a keen interest in Debtors' assets.  The connection of the three individuals to Gulf Coast is particularly revealing since Gulf Coast eventually acquired the N/2 ST52 lease for over $300,000.00.  It is disquieting that the three defendants (who were allegedly in control of the Debtors) permitted the lease to lapse and then, through a company with which they were affiliated, subsequently acquired the same lease.  It seems plausible that such a feat required a meeting of the minds.  These facts, which are set forth in more detail above, support the conclusion that Plaintiffs have alleged a plausible meeting of the minds between Cheatham, Morgan, and Thibeaux concerning the expiration and acquisition of N/2 ST52.

Next, it is plausible that Plaintiffs' civil conspiracy claim satisfies the fourth requirement: the intent to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  Obviously, there is nothing inherently unlawful in a company's act of submitting the winning bid for an oil and gas lease through a GLO auction.  However, given the Defendants' alleged breaches of their fiduciary duties (allegations that are not dismissed), it is plausible that Cheatham, Morgan, and Thibeaux accomplished a lawful purpose by unlawful means.  If it was unlawful for the individuals to remain quiet while the N/2 ST52 lease expired, then it is of no consequence that the act of submitting a winning bid was potentially lawful.  It is plausible that Cheatham, Morgan, and Thibeaux knew they could not acquire the N/2 ST52 tract without first (unlawfully) permitting the Sterling estate's N/2 ST52 lease to expire.  Accordingly, the fourth civil conspiracy requirement is satisfied.

Finally, the Plaintiffs have easily established the plausibility of the fifth requirement, damages proximately caused by the conspiracy.  The N/2 ST52 lease was a valuable estate asset,

a fact demonstrated by Gulf Coast's willingness to pay in excess of $300,000.00 to acquire it. Plaintiffs also allege that significant oil and gas reserves were under the N/2 ST52 tract. It is, therefore, plausible that Plaintiffs were damaged when the estate's interest in the N/2 ST52 lease, which allegedly could have been inexpensively retained, quietly expired.

The Court finds that Plaintiffs have stated a claim for civil conspiracy against Cheatham, Morgan, and Thibeaux. The Motions to Dismiss Plaintiffs' civil conspiracy claim are denied.

### 4.  Plaintiffs' Claims for Fraud and Fraud by Nondisclosure

Claims for fraud must be pled with particularity. Fed. R. Civ. P. 9(b). "What constitutes 'particularity' will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). However, it is well-settled that the particularity standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Brown v. Bilek*, 2010 WL 4561397, at *4 (5th Cir. Nov. 12, 2010).

Plaintiffs have alleged claims for common law fraud and fraud by nondisclosure against Defendants. As set forth below, the Court grants, in part, and denies, in part, Defendants' Motions to Dismiss the Plaintiffs' fraud claims.

### a.  Plaintiffs' Fraud Claims

The elements of common law fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*In re First Merit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

The Court finds that Plaintiffs have alleged plausible claims for fraud against Thibeaux, NCE, and Morgan.

### i.  Plaintiffs Have Raised a Plausible Fraud Claim Against Thibeaux

After the Court converted the Debtors' cases, Thibeaux allegedly offered to purchase Debtors' assets from the Trustee through an Australian company named Petsec Energy Co. Thibeaux made the offer on Petsec letterhead.  However, Plaintiffs claim that Thibeaux neither sought nor received authorization or approval from Petsec to submit such an offer to the Trustee. The Trustee believed that Thibeaux represented Petsec and contemplated a sale of assets to the company.  The Trustee later learned that Thibeaux had no authority to act on behalf of Petsec. The Trustee was then forced to terminate a proposed sale to Petsec.  It can be inferred from these facts that the Debtors were potentially harmed by the opportunity cost and administrative expense associated with the time spent contemplating the allegedly false Petsec offer submitted by Thibeaux.

These facts satisfy all of the elements needed for a plausible fraud claim.  Since Plaintiffs have stated a plausible claim for fraud against Thibeaux, Thibeaux's Motion to Dismiss is denied.[17]

### ii.  Plaintiffs Allege Plausible Fraud Claims Against Morgan & NCE

The Court finds plausibility is satisfied in Plaintiffs' claim that Morgan and NCE committed fraud by misrepresenting NCE's intent to purchase the Debtors' assets.

On multiple occasions, including during hearings before this Court, NCE (through Morgan and its counsel) represented that it intended to purchase the Debtors' assets.  Plaintiffs

---

[17] The Complaint contains additional allegations concerning possible fraudulent conduct on the part of Thibeaux. The Court need not address these allegations since Plaintiffs have raised a plausible claim for fraud arising from the proposed sale with Petsec.

have now alleged, however, that by July 2009 NCE had decided not to purchase Debtors' assets. Thus, all of the representations to the contrary, which occurred after July 2009, were allegedly made by NCE with knowledge that they were false.   For instance, Plaintiffs allege that on September 16, 2009, Morgan caused a commitment letter from H.E.B., LLC to be published to the Court stating that H.E.B. agreed to commit $4,650,000.00 to NCE to fund the new plan of reorganization.   According to Plaintiffs, neither Morgan nor NCE intended to fund this new plan when Morgan made this representation.

It is also quite plausible that the representations were made with the intent to induce the Court and other creditors to act upon them.   In fact, at this juncture, the Court fails to see any other reason why the statements would have been made.   Without the prospect of a sale of the Debtors' assets to NCE, the case would most likely have been converted to chapter 7 much sooner.   It was the hope of consummating a sale of assets to NCE that primarily kept the chapter 11 proceedings alive.   Thus, the Court and the creditors—many of whom repeatedly chose to avoid conversion in the hope of receiving a larger payoff through a chapter 11 sale to NCE— acted in reliance upon these alleged misrepresentations.

Finally, it is plausible that the bankruptcy estates were injured by the alleged misrepresentations.   The misrepresentations prolonged the chapter 11 proceedings and unnecessarily increased the Debtors' post-petition operating costs and administrative expenses. Had the Debtors' cases been converted in July 2009, it is plausible creditors would have received an increased payout.

The Court finds Plaintiffs have raised a plausible claim for fraud against NCE and Morgan.   Dismissal of this claim is denied.

### iii.  The Fraud Claims Against Gulf Coast & Coastland are Dismissed

Plaintiffs have not raised plausible claims for common law fraud against Gulf Coast and Coastland.  Even when taking the complaint's allegations as true, the complaint does not consist of factual allegations against Gulf Coast and Coastland that satisfy all of the elements of fraud.  To the extent Plaintiffs asserted claims for fraud against Gulf Coast and Coastland, the claims are dismissed.

### b.  Plaintiffs Have Not Raised Plausible Claims for Fraud by Nondisclosure

The elements of fraud by nondisclosure are:

> (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge.

*7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys.*, 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

The Court finds Plaintiffs have failed to state a claim for fraud by nondisclosure with particularity against Thibeaux, Morgan, NCE, Gulf Coast, or Coastland.  Each claim for fraud by nondisclosure contains gaps in the necessary elements that must be alleged to survive a motion to dismiss.  Similarly, the fraud by nondisclosure claims contain conclusory allegations which lack the specificity mandated by Rule 9(b).  Accordingly, the Court dismisses the fraud by nondisclosure claims against Thibeaux, Morgan, NCE, Gulf Coast, and Coastland.

**5.  Plaintiffs Have Raised a Plausible Claim Under 11 U.S.C. § 549**

Plaintiffs seek to avoid the transfer of the N/2 ST52 lease to Gulf Coast under 11 U.S.C. § 549.  Section 549 provides, in relevant part, that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court."  11 U.S.C. § 549(a).  The Court finds Plaintiffs have raised a plausible avoidance action.

Gulf Coast argues that dismissal of the Plaintiffs' § 549 claim is proper because the transfer of the estate's interest in N/2 ST52 to the GLO was authorized under §§ 362(b)(10) and 541(b)(2).  Section 362(b)(10) provides, in relevant part, that the automatic stay does not apply to "any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease . . . during a case under this title to obtain possession of such property." 11 U.S.C. § 362(b)(10).  Section 541 provides, in relevant part, that property of the estate "ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case."  11 U.S.C. § 541(b)(2).  According to Gulf Coast, once the lease expired, it became property of the GLO and was no longer property of the estate.  Therefore, the GLO's subsequent transfer of the N/2 ST52 lease to Gulf Coast is not avoidable.

The Court finds, however, that an avoidance action could exist if the lease's expiration (and reversion back to the GLO) was part of an unlawful step-transaction designed to accomplish the transfer of N/2 ST52 to Gulf Coast.  The step transaction doctrine, which is most commonly associated with tax cases but is also applicable in bankruptcy proceedings, provides that "multi-step transactions can be collapsed when the steps of the transaction are 'part of one integrated transaction.'"  *Shier v. SAF Fin., Inc.* 2010 WL 40344272, at *7 (D. Md. Oct. 14, 2010) (quoting

32

*United States v. Tabor Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986)).  *See also Del Commercial Props., Inc. v. Comm'r.*, 251 F.3d 210, 213 (D.C. Cir. 2001) ("Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes.").  Courts must consider the substance over the form of the transactions at issue in determining whether to treat what appear to be multiple transactions as one.  *See also Del Commercial Props.*, 251 F.3d at 214 ("Although taxpayers 'are entitled to structure their transactions in such a way as to minimize tax,' there must be a purpose for the 'business activity ... other than tax avoidance' and that purpose cannot be a 'facade.'") (quoting *ABA Investerings v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000)).

In this case, Gulf Coast may have been able to purchase the estate's interest in the N/2 ST52 tract directly from the estate before the lease's expiration.  Instead, Gulf Coast—a company which was controlled by (and the employer of) insiders of the Debtors—allegedly waited for the lease to lapse before acquiring it.   Gulf Coast, Cheatham, Thibeaux, and Morgan were allegedly aware, based on information obtained from the Debtors, that the reserves under N/2 ST52 were potentially lucrative.  Gulf Coast later bid over $300,000.00 for the lease, even though leases for neighboring properties sold for approximately one-seventh the price of N/2 ST52.  These allegations beg the question of whether the Defendants only purpose for permitting the lease to lapse was to enable Gulf Coast's subsequent acquisition of the lease at a bargain price.  If so, it is plausible that the estate could reclaim the lease under the step-transaction doctrine.

In sum, it is plausible that the Defendants' sole purpose in allegedly allowing the N/2 ST52 lease to lapse was to enable Gulf Coast to acquire it.  This set of facts raises a plausible

avoidance action under § 549 and the step-transaction doctrine.  Gulf Coast's motion to dismiss Plaintiffs' § 549 avoidance action is denied. [18]

### 6.  Plaintiffs' Claim for "Conversion/Unjust Enrichment/Self-Dealing"

Plaintiffs assert a claim under the headnote of "conversion/unjust enrichment/self-dealing."  *See* ECF No. 52 ¶ 63.  As in Section 1 above, the Court considers the claim as three separate causes of action.

### a.  Plaintiffs Have not Raised a Plausible Claim for Conversion

"Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over personal property of another, to the exclusion of or inconsistent with the owner's rights."  *Dorchester Gas Producing Co. v. Harlow Corp.*, 743 S.W.2d 243, 252 (Tex. App.—Amarillo 1987, writ dism'd by agr.). To prove conversion, a claimant must establish: "(1) it owned or had legal possession of the property or entitlement to possession, (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the claimant's rights, (3) the claimant demanded return of the property, and (4) the defendant refused to return the property."  *Hunt v. Baldwin*, 68 S.W.3d 117, 131 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Plaintiffs claim that Morgan, Thibeaux, Gulf Coast, and Coastland converted the Debtors' data.  Plaintiffs also claim that Thibeaux and Gulf Coast converted the Debtors' interest in N/2 ST52.  Finally, Plaintiffs claim that all Defendants (except NCE) took the Debtors' business opportunities and that Morgan wrongfully used or took cash collateral.

---

[18] The Court also rejects the claim that the Trustee lacks standing to pursue a § 549 action.  The Trustee planned to sell but never actually sold its interest in the N/2 ST52 lease to Mining Oil.  Should the Plaintiffs recover the N/2 ST52 lease from Gulf Coast, the lease will first return to the estate.  The lease will then be maintained in accordance with the Claims Allocation Agreement (between the Plaintiffs), which was approved by the Court on February 10, 2011.  *See* Case No. 08-38121, ECF No. 859.  The estate retains an interest in the proceeds of the N/2 ST52 lease under the Claims Allocation Agreement.  Accordingly, Gulf Coast's claim that the Trustee lacks standing is without merit.

As set forth below, Plaintiffs fail to state a claim for conversion.

### i. Conversion of Debtors' Data

Plaintiffs have failed to assert a plausible claim for conversion of the Debtors' data against Morgan**,** Thibeaux, Gulf Coast, and Coastland.   These Defendants allegedly used the Debtors' information for the purpose of appropriating Debtors' business opportunities and interest in the N/2 ST52 lease.   According to Plaintiffs, such use of Debtors' data was without authorization and inconsistent with the Debtors' rights.   However, Plaintiffs fail to allege all of the elements necessary for a claim of conversion, namely that Debtors' demanded a return of the data and that Defendants refused the demand.   Accordingly, the Court dismisses Plaintiffs' claim that Morgan, Thibeaux, Gulf Coast, and Coastland converted Debtors' data.

### ii. Conversion of Debtors' Interest in the N/2 ST52 Lease

Plaintiffs also claim that Thibeaux and Gulf Coast converted the Debtors' interest in the N/2 ST52 lease.   This claim must fail because (i) conversion only applies to interests in *personal* property, and (ii) the N/2 ST52 lease was an interest in *real* property.

"[I]nterests in oil and gas rights—such as working interests and royalty interests in oil and gas leases—are considered interests in real property."   *Trutec Oil & Gas v. W. Atlas Int'l., Inc.*, 194 S.W.3d 580, 583 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citations omitted).   *See also Russell v. Panhandle Producing Co.*, 975 S.W.2d 702, 708 (Tex. App.—Amarillo 1998, no pet.) ("[A]n interest in an oil and gas lease is deemed to be an interest in real estate, and . . . before gas is produced and brought to the surface, it is real property."); *EOG Res., Inc. v. Wall*, 160 S.W.3d 130, 138 (Tex. App.—Tyler 2005, no pet.) ("The right to free gas under an oil and gas lease is an interest in real property that can be acquired or lost by adverse possession under applicable statutes of limitations.").   On the other hand, "[a]lthough oil and gas beneath the

surface of the land are considered part of the realty, once removed from the land they become personalty." *Rogers v. Ricane Enters., Inc.*, 930 S.W.2d 157, 165 (Tex. App.—Amarillo 1996, writ denied) (citation omitted). *See also Cone v. Fagadua Energy Corp.*, 68 S.W.3d 147, 169 (Tex. App.—Eastland 2001, pet. denied) ("[T]he proceeds of the sale of oil and gas are things that can be converted.").

Plaintiffs fail to allege that Thibeaux and Gulf Coast converted oil or gas that had previously been removed from the land. In fact, Plaintiffs state that the N/2 ST52 lease was not producing at the time of the alleged conversion. Plaintiffs only claim that the N/2 ST52 lease itself was converted. This claim is without merit. The N/2 ST52 lease was an interest in real property and conversion only applies to personal property.

Accordingly, Plaintiffs have failed to state a claim for conversion of the N/2 ST52 lease.

### iii.   Conversion of Business Opportunities and Cash Collateral

Finally, Plaintiffs have failed to state a claim for conversion based upon the allegations that (i) Defendants took Debtors' business opportunities, and (ii) Morgan took Debtors' cash collateral. Plaintiffs fail to allege anything more than the conclusory statement that Morgan took cash collateral. Plaintiffs also fail to allege that they demanded a return of the business opportunities (or the cash collateral) from Morgan.

Thus, Plaintiffs have failed to state a claim for conversion of business opportunities or cash collateral. Plaintiffs' conversion claim is dismissed.

### b.  Plaintiffs Have Raised a Plausible Claim for Unjust Enrichment

Plaintiffs have raised plausible claims for unjust enrichment against Morgan, Thibeaux,

Gulf Coast, and Coastland.[19]

Texas courts have recognized the existence of an independent cause of action for unjust

enrichment.  *Cristobal v. Allen*, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July

22, 2010, no pet.) ("Although unjust enrichment is usually characterized as a basis for quantum

meruit recovery, we have held that it can be an independent cause of action.") (citing *Pepi Corp.*

*v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  Unjust

enrichment is based upon the equitable principle that one who receives benefits unjustly must

make restitution for those benefits.  *Id.*  "Unjust enrichment occurs when the defendant

wrongfully secures a benefit or passively receives a benefit which would be unconscionable to

retain."  *Id.*  A plaintiff may recover under the theory of unjust enrichment if the defendant

"obtains a benefit from the plaintiff 'by fraud, duress, or the taking of an undue advantage.'"  *Id.*

Plaintiffs have raised a plausible claim for unjust enrichment against Thibeaux and Gulf

Coast based upon the expiration and subsequent purchase of the N/2 ST52 lease.  Thibeaux

allegedly controlled the Debtors and was aware of the potentially vast reserves under the N/2

ST52 tract.  Thibeaux nevertheless remained silent while the lease lapsed.  Thibeaux later

purchased the lease through Gulf Coast for over $300,000.00.  According to Plaintiffs, Thibeaux

and Gulf Coast obtained the benefits of the lease unjustly by taking advantage of Thibeaux's

knowledge of N/2 ST52's value and his control over the Debtors.

Plaintiffs have also raised a plausible claim for unjust enrichment against Morgan and

Coastland based upon their use of the Debtors' data.  Morgan reviewed and copied Sterling's

---

[19] NCE is not mentioned in the portion of the complaint concerning unjust enrichment and, thus, it does not appear that Plaintiffs seek to recover from NCE on the basis of unjust enrichment.  However, to the extent Plaintiffs seek such a recovery, the claim is dismissed.

37

proprietary data from computers owned by the bankruptcy estate.  Plaintiffs contend that Morgan then used this information for the benefit of Coastland; for instance, to enable Coastland to acquire certain leases in Matagorda Bay.  Thus, Morgan and Coastland unjustly benefited from Morgan's use of the Debtors' data for Coastland's benefit and at the Debtors' expense.

Plaintiffs have raised a plausible unjust enrichment claim against Thibeaux, Morgan, Coastland, and Gulf Coast.  Those defendants' Motions to Dismiss this claim are denied.

### c.  Plaintiffs Have Not Raised a Plausible Self-Dealing Claim

Plaintiffs completely fail to elaborate upon their self-dealing claim in their Complaint. Plaintiffs do not provide a legal basis for their claims and provide only a minimal amount of factual information (in the portion of the complaint concerning self-dealing) that could be construed as relating to a claim for self-dealing.  The Court is also unaware of the existence of an independent cause of action for self-dealing, apart from one which arises in the context of a breach of a duty.  *See, i.e., Occidental Permian Ltd. v. Helen Jones Found.* --- S.W.3d ----, 2011 WL 291966, at *7 (Tex. App.—Amarillo, Jan. 31, 2011) ("The Texas Supreme Court has noted that the implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's self dealing or negligence.") (citations omitted); *Franks v. Raodes*, 310 S.W.3d 615, 624 (Tex. App.—Corpus Christi 2010, pet. denied) ("A breach of fiduciary duty occurs when an attorney benefits improperly from the attorney-client relationship by, among other things, . . . engaging in self-dealing . . . ."); *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984) (holder of executive right is obligated not to engage in self-dealing to the detriment of the non-executive mineral owners).   The Plaintiffs' claims for breach of fiduciary duty have been discussed above and will not be reexamined here.  To the extent Plaintiffs assert separate claims for self-dealing

against defendants Morgan, NCE, Thibeaux, Gulf Coast, and Coastland, those claims are dismissed.[20]

## CONCLUSION

For the reasons set forth above and in accordance with Federal Rule of Civil Procedure 12(b)(6), the Court dismisses the following claims:

1.      Plaintiffs' claim for undue influence against Thibeaux and Morgan;

2.      Plaintiffs' claim for fraud against Gulf Coast and Coastland;

3.      Plaintiffs' claim for fraud by nondisclosure against all Defendants (except Cheatham);

4.       Plaintiffs' claim for conversion against all Defendants (except Cheatham); and

5.      Plaintiffs' claim for self-dealing against all Defendants (except Cheatham).

All other relief sought in Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint is denied.

A separate order consistent with this Memorandum Opinion will be issued.

SIGNED **March 24, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[20] Nothing in this section is meant to alter or affect the Court's holding concerning Plaintiffs' claims for breach of fiduciary duty against Morgan and Thibeaux.